Good afternoon, ladies and gentlemen. You may be seated. We are here for a re-hearing on Bonk in the case of Democratic National Committee v. Hobbs. We'll hear from the panelists. Good afternoon, Chief Judge Thomas, members of the panel, and may it please the Court. My name is Bruce Spiva, and I represent the plaintiff appellants in this action with me at council table are my colleagues from Perkins Coie, Amanda Kalei, and Sarah Gonsky. I would like to reserve five minutes for rebuttal, if I may. Plaintiffs challenge two provisions of Arizona law. I will start by discussing plaintiffs' challenge to Arizona's practice of disenfranchising individuals who vote in the wrong precinct on election day by discarding their ballots entirely rather than partially counting those ballots for offices for which they are eligible and have a constitutional right to vote. The disenfranchised are overwhelmingly, disproportionately Native American, African American, and Hispanic. Arizona's policy violates Section 2 of the Voting Rights Act, and it unconstitutionally burdens the right to vote under the First and Fourteenth Amendments. Second, I will discuss plaintiffs' challenge to HB 2023, which criminalized a method of voting that was widely used and depended upon by minority voters in Arizona. This law makes it harder for minorities to vote in Arizona and violates the Constitution and the Voting Rights Act. Let me start with the out-of-precinct voting challenge. Arizona has consistently led the nation in disenfranchising Arizona residents who vote in the wrong precinct, and the District Court found that. The District Court recognized that Arizona's practice of discarding OOP ballots disproportionately disenfranchises minority voters, and the fact is that minorities are vastly overrepresented among the disenfranchised. In 2016, minorities cast OOP ballots at approximately twice the rate of non-Hispanic whites in Arizona, and that was consistent with the stark racial disparities in OOP voting over time. And that's not by chance because of the way Arizona administers its election system, essentially through maladministration. As the District Court gave great weight to expert testimony that the plaintiffs put on in this case, that Arizona moves polling places around very frequently. Forty-three percent of all polling places in Maricopa County, where Phoenix is, changed between 2006 and 2008. And another... Does the state or do the localities tell us why they move the precincts so frequently? There is, I don't believe anything in the record, Your Honor, that goes to that issue of why the precincts are moved so frequently. So we have the consequence, but we don't have the justification. We don't have a justification. The state has not offered a justification for the frequent moves. And the result of those frequent moves, Your Honor, is that people vote out of precincts more frequently because it causes confusion. Voters whose polling places change were 40% more likely to vote out of precincts. Is that what the statistics supported? It seemed like the numbers went down of people voting out of precincts. Well, I was referring, Your Honor, to the shifting of the polling places. You are correct, Your Honor, that the absolute number of people who voted out of precincts did go down in the 2016 election. It was still quite substantial. It was close to 4,000 votes that were entirely discarded because of voting in the wrong precinct. And it was still... Arizona still led the nation in terms of the number of people who voted out of precincts. And the statistics that we have now that we didn't have previously is the DOJ that's charged with enforcing the voting rights has weighed in on that, and I'm sure that you've reviewed it. I was a well-prepared advocate. And it argues that we should affirm. It takes some exception with the district court's ruling and the majority's ruling in a certain area. But what's your response to the DOJ's position on both, one, the proper legal standard, and two, the application of the standard to the facts of this case? Yes, Your Honor. While there is a point of agreement with the DOJ's brief, in terms of the DOJ rejects as a proper standard the district court's holding that there had to be a threshold number of voters in the case of the OOP voters who had been thrown out, or that it had to be somehow outcome determinative. So you won the battle, but you lost the war with DOJ there. Well, there are other points of disagreement, Your Honor. Although their brief is a little unclear on this point, they essentially argue for importing a requirement into the Voting Rights Act, and they're only opining on the Voting Rights Act analysis that the burden on minorities must be material, which is something more than a showing of disparate burden. And my concern is that that is intended and would result in courts applying a heightened standard to get past the first step of the Voting Rights Act test, which is what they essentially, what DOJ does, I think, essentially when they start arguing that our even while acknowledging that we don't have to prove the case with statistical evidence, the proper test is the two-part test that the Supreme Court has set forth and that this court and other courts have followed, which is one, that to prove a violation of Section 2 of the Voting Rights Act, plaintiffs must show a disparate burden on protected classes, and two, have to show that that burden is linked to certain factors, the so-called Senate factors of discrimination, and that based on the totality of the circumstances that it causes minority voters to have less opportunity to participate in the political process. And so that's my point of concern in contention with the DOJ brief. In addition, they interpret the totality of the circumstances test, Your Honor, to focus on the entire voting scheme in determining whether the challenged provisions discriminate against minorities. But if the state takes away a method that is used and relied upon more by minorities, which I think we showed here and also really consistent primarily with the district court's fact findings, it's not okay just because there are other potential ways that minorities can vote. The Voting Rights Act protects against both the abridgment and the outright denial of the right to vote, and I think their test or their spin on the test would result in many voting methods that actually would abridge minorities' rights to vote passing muster because the test is more stringent. I think, I guess a final point on that, Your Honor, is the theme of the DOJ's brief is that if the voting, they essentially argue that we're arguing for a test under the Voting Rights Act that is too easy, essentially, and that if the court applies that test, we contend, of course, that the test that we are advocating is the test that this court has adopted in Farrakhan and other cases. But if it's so easy to pass the test, that will result in the rejection of all sorts of election rules just because there's a disparity, a bare statistical disparity among the races. And I think my short answer is, no, it will not, and it has not, because there's certainly no evidence in the case law that there's been this massive undermining of nondiscriminatory election regulations because the test is too easy. It's still a rigorous test, but it's a test that was set forth in the text of the Voting Rights Act, and it's intended to catch, to cover, to essentially eliminate discrimination in voting nationwide, and that's a results test, not an intent test. Counsel, there are other states in this circuit that have the same law as Arizona. If we were to affirm the district court, does that affect other laws in the circuit? Not necessarily, Your Honor, because the test, both under the Voting Rights Act and under Anderson verdict, is an intensely localized test. Let's suppose that the other three states were looking to reform their election laws and decided that Arizona had a good model for them and adopted Arizona's laws word for word. So we had three other states that had the same law. Does that strike you as anomalous, or is it appropriate under the Voting Rights Act that if the provision fell in one state that it would not affect laws in other states? Here are the other factors that I think the court would be confronted with if you had a challenge to, say, a different state's laws. There are special challenges, both on the Native American lands in Arizona and in urban, densely populated urban areas, that have intersected and have amplified the disparate burden on minority voting, both with respect to the out-of-precinct voting issue and the ballot collection issue, and I think Your Honor's question was focused on the out-of-precinct issue, if I understood correctly. And so those conditions may or may not pertain in other states. Some of those states actually do partially count ballots, by the way. The implication of your argument, then, is that even if we were to adopt what everybody would concede would be good government principles, if we had, for example, a model election code that was prepared by some neutral committee of a state-by-state basis, that even adopting a model election code, certain provisions might be struck down in some states but not be struck down in other states, that seems like a really strange result. Well, that is the potential result, Your Honor, I think that is compelled by both the language and the interpretation of the Voting Rights Act from the Supreme Court, for instance, in Jingles, where it says you have to look at these factors in the jurisdiction where you're challenging them. And we have shown, and this is also, again, consistent with the district court's finding, that there are these special challenges that are related to socioeconomic factors there that may not pertain elsewhere. So let's suppose that I was not persuaded that you had mustered sufficient evidence to show that Arizona adopted this because it would result in this way. Is it sufficient to allege, then, that Arizona is at fault because it continues to that has this disparate impact? Well, we do not claim that the OOP regime that Arizona has is based on intentional discrimination. Our claim there is twofold, that it violates the Voting Rights Act because it has a disproportionate impact on minority voters in Arizona, and that that impact is linked to the Senate factors, the socioeconomic factors, and in addition, factors like the history of discrimination in voting rights, responsiveness to minority concerns in Arizona. All of those are particular to Arizona. And Arizona, in fact, leads the nation in throwing out ballots, which is essentially disenfranchisement of these voters for offices which they have the constitutional right to vote. Many other states that have precinct-based models don't do that. They actually do partially count. There are 21 states in the District of Columbia that actually partially count. And how many states have a provision similar to Arizona's? I don't know the exact number, but there are a number of states that have a precinct model that do not count the ballots. Many of them, though, don't have anywhere – none of them have any renewed numbers. What do the numbers – what would the numbers tell us? So the Sixth Circuit found that it was 27 states that have the same provision as Arizona. Now, I haven't done the counting myself, so I – and that may have changed because that's the Sandusky case. It's a little bit – it's a little bit old now. Yeah, that's – But if – what do those numbers mean to us? The fact that 21 have gone to something that perhaps seems to be a more progressive system, but other states have – are there – what do those numbers – what do those numbers mean to us? Right. And the 27-number figure, I should just case you that, is incorrect. That is not the case anymore. I can't give you the – I can probably get it before rebuttal, but I can't give you the exact number who actually throw out the ballots. I can tell you none of them throw out as many. And what it tells you, Your Honor – and this is, again, the district court found this – that it's feasible for Arizona to partially count these ballots and not disenfranchise these voters. And so, really, I think what – we didn't have a lot of difficulty with the – with most of the district court's fact findings. It's more with the legal errors it made that led it to the wrong conclusions. With respect to the out-of-precinct ballot policy, the policy of not counting these ballots, one of the legal errors that the district court made is, at step one of the Voting Rights Act analysis, is to say that there have to be a certain number that – of voters who were disenfranchised in order to show a burden. Well, of course, that is not what the Voting Rights Act calls for. It – any kind of disproportionality is actionable. As I think Judge Thomas pointed out in his dissent, and as our experts also pointed out, there, of course, have been many elections in Arizona where the margin of victory was smaller than the number of out-of-precinct ballots that were thrown out. But that legal error in saying that there was no burden that plaintiffs failed at step one because they hadn't shown a critical mass, if you will, of voters whose votes had been thrown out, despite the fact that thousands of voters' ballots were thrown out, were disenfranchised, it was legal error, and I think inconsistent with both this court's and the Supreme Court's precedent. The second legal error in that regard is at the – for the OOP issue, the district court also legally erred in holding that the DNC must demonstrate that the policy of not counting the OOP ballots itself caused disparate rates of OOP voting. And I submit to you that that really kind of gets the analysis backwards and is inconsistent with this court's holding in the Farrakhan case. Rather, a law violates the Voting Rights Act when it imposes a discriminatory burden on members of a protected class, and when that burden is in part caused by or linked to discriminatory conditions. The district court kind of reversed that inquiry and suggested that the burden of having votes going uncounted has to – we needed to show that that leads to the socioeconomic disparities and in turn to OOP voting. The district court did recognize that these socioeconomic disparities between whites and minorities increased the likelihood of out-of-precinct voting, and it also recognized a number of the Senate factors that contributed to this problem. But because of these legal errors that I've pointed out, I think it led it to the wrong conclusion. In step two of the analysis, the – essentially, the district court held that the various Senate – that some of the various Senate factors weighed in plaintiff's favor and that some did not. Some of those findings, I think, were legal error, and others were either mixed questions of fact and law or were clearly erroneous. The – in terms of the history of official discrimination connected to voting, which is one of the factors in Arizona, the district court discounted the long history of discrimination based on sporadic improvements and the fact that both political parties had engaged in discrimination over time. Well, of course, that is a legal error because it's not relevant whether both parties engaged in racial discrimination in terms of whether that factor weighs in favor of a finding of a violation of the Voting Rights Act. The district court correctly found that there was a long pattern of racially polarized voting in Arizona that continues to this day. The district court also found in the plaintiff's favor in terms of finding that whether systemic discrimination disproportionately affects minority groups' access to the polls. The district court also recognized racial appeals in political campaigns all the way to the present, including with respect to HB 2023, one of the provisions we are challenging. The district court recognized that minorities are underrepresented in office in Arizona based on their numbers but kind of downplayed that factor, I think, in a way that really is clear error because that factor clearly, when you look at the numbers that are in the briefing, clearly weighs in the plaintiff's favor. And with respect to responsiveness to the needs of the minority communities, the district court found that the evidence was insufficient and it essentially pointed to the Arizona Citizens Clean Elections Commission and said that based on the fact that that commission, that one entity had done some outreach to minority communities, that that meant that there was insufficient evidence of lack of responsiveness and we would submit that that is clear error. There's well-documented evidence of lack of responsiveness that overwhelms this one example, including from our experts like Dr. Lichtman, who the district court credited, and also including the history of HB 2023, which I'll get to in just a moment. And in terms of tenuousness, here again is a legal error. This is the last Senate factor I'll discuss. The district court analyzed whether the importance of the policy underlying the challenged restriction here, the practice of throwing out OOP ballots, by stating it, by inquiring into the basis the state had for a precinct-based system. We, of course, do not challenge Arizona's precinct-based system. We are challenging the precinct-based system entirely, and there's no logical reason why Arizona can't maintain a precinct-based system to the extent it still has one. There are many counties in Arizona that do not actually operate on a precinct-based system, but there's no reason why they can't maintain a precinct-based system and also count ballots for which these voters have a constitutional right to vote. Very briefly, before I turn to HB 2023, the practice of disenfranchising these OOP voters also violates the First and Fourteenth Amendments. The district court made several legal errors in valuating the burden as compared to the state's interests in the so-called Anderson verdict test. Again, it mischaracterized the burden as the burden of complying with the precinct system, whereas I think properly construed the burden is disenfranchisement. It said that counting the votes won't make it easier for voters to find the polling place, and of course that again is another form of kind of by itself causation of the type that this court has rejected. It did a kind of simplified equation of Arizona's policy of discarding OOP votes with similar policies in other states, but again that I think misses the intensely local appraisal that must be done under both the Voting Rights Act and the Anderson verdict test. And finally, the district court failed to look at subgroups, the groups that were impacted, because I think it was very focused on the number of people impacted, although we would maintain it quite substantial. Under this court's... Can I interrupt? Your time is running on you, and I would appreciate it if you could get to the ballot collection issue, and I anticipate that your colleagues on the other side will mention North Carolina. Could you respond to that? Sure, Your Honor. Yes, the district court found here that there was no evidence of fraud in connection with ballot collection in Arizona in the legislative record, that that was not the basis for HB 2023. The type of fraud that was recently discovered in the congressional election in North Carolina 9 by the campaign of the that was already unlawful under Arizona law prior to the enactment of HB 2023. Taking someone's ballot and throwing it in the trash, altering it, destroying it, all of those things were and are unlawful under Arizona law, and of course they are unlawful in North Carolina as well. North Carolina did ban ballot collection in its entirety, and that of course didn't prevent the type of determined fraud that engaged upon by an election campaign, and any more than essentially what the Arizona legislature did is, without any evidence of fraud in ballot collection in Arizona, essentially kind of threw the baby out with the bathwater. I mean, the analogy I would draw would be, well, because sometimes people stuff ballot boxes, we're going to ban ballot boxes. There are also particular needs in Arizona that we've shown in the record, and I think that the district court recognized for ballot collection. The Native American lands spread over vast areas where people, only 18 percent of the people, have home mail delivery service, where people have to travel 45 minutes to two hours to get to a mailbox, where there's a big problem with the precinct system because the tribal precincts and the precincts of the county often don't mesh, and so when somebody actually goes to the polls to vote, if they have the transportation, et cetera, to do that, they often end up voting out of precincts. So there's a need for mail voting, but in order to accomplish that, there's a big need for ballot collection. Same is true in some of the densely populated urban areas, particularly in minority communities. Same is true in some rural, overwhelmingly Hispanic areas like San Luis and Somerton. All of these things that I just said are findings of the district court. Where it went wrong, I think both at the analysis under the Voting Rights Act and its analysis in Anderson Burdick, is very similar to where it went wrong with OOP, saying that there has to be a precise number. It found that there was this disproportionately impacted minorities, but because it couldn't find that with exactitude, it said, well, I can't find that there's a burden. That's not the law under the Voting Rights Act. And similarly... You know, so on that point, which may cover both issues, am I correct in understanding that the total number of votes cast in 2016 was 2.6 million? I think that's correct, Your Honor. And with respect to voters casting ballots out of precincts, it was just about 4,000, 3970 or something like that. In 2016? Yeah. That is correct. Which is about 0.15 percent, down from roughly 6 percent at the peak. Are we on the same track? Well, I think the percentages of all ballots cast, right, I think in terms of a percentage of people who voted at the polls on Election Day, I think the percentage was more in the 1.5 percent range. I don't have the precise percentage, but it was still a substantial percentage of that vote, which of course is the only... Well, where's the dividing line? Suppose it were only, instead of 4,400, would your argument be the same? Well, it would be the same, Your Honor, but I think there might be a difference because all the evidence that we showed that many people can't find the right precinct, don't have the resources to go to the correct precinct, those may be diminished somewhat if almost everybody was able to find and get to their correct precinct. Well, how about 40? 4,400, now 40. If there were only 40 ballots that were not counted or rejected, whatever, out of the, either way, the 2.6 million or whatever the other number is, the lower number. What about that? I'm trying to get a handle on what the dividing line is. Yes, the analysis would be the same, Your Honor, but I would agree, though, that it would get more difficult for us to meet our burden the smaller, if the number got down to that, such a small number. If I might, I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. We'll hear from the State. May it please the Court, I'm Andrew Pappas on behalf of Arizona Attorney General Mark Brnovich. I'm going to be sharing 10 minutes of my time with the United States and five minutes with the defendant intervenors. After a 10-day bench trial, the district court found that both the precinct vote rule and HB 2023 impose only a minimal burden and that neither law represents a significant increase over the ordinary burdens traditionally associated with voting. Those findings, which this Court reviews for clear error, are fatal to plaintiff's claims. Maybe you can start with the Section 2 claims, the dominant focus of your opponent's argument. I'm happy to, Your Honor. There are two Section 2 claims, of course, one challenging the out-of- precinct rule, the other challenging HB 2023. I'll begin with the out-of-precinct rule, as my opponent did. The district court found, importantly, that there was no meaningfully disparate impact on the opportunities of minorities to elect their preferred representatives. We know from this Court's precedents and Gonzales and elsewhere that that ultimate Section 2 finding is a factual finding reviewable only for clear error. The district court found that among the 20 percent of voters who vote in person in Arizona, 99 percent of minorities and 99.5 percent of non-minority voters voted in the right precinct in the 2016 general election. It's based on those statistics, by the way, that my opponent says that twice as many minorities voted out-of-precinct as non-minorities. They've divided 99 percent by 99.5 percent and said that's twice as much. As Judge Easterbrook says in the Frank decision in the Seventh Circuit, that's why you don't divide percentages, because they present a very misleading view of statistics. I don't see what's misleading about the statistics here. It seems to me we're trying to figure out whether a particular practice burdens disproportionately members of minority groups, and here we know that a far larger number of minority voters end up having their votes not counted as opposed to white voters. I don't understand what's misleading about that. What we're trying to figure out, Judge Watford, under Section 2 of the Voting Rights Act is whether the particular voting practice results in the abridgment or denial of the right to vote, which means that minority voters have less opportunity to participate in the political process and elect representatives of their choice. The district court, I think, was absolutely correct to find that if 99 percent of minority voters and 99.5 percent of non-minority voters are voting in the correct precinct, then there is no meaning of full effect whatsoever of the out-of-precinct rule. So, counsel, do we just disregard those voters who do not have their votes counted? Do we just disregard that? No, Your Honor, and Judge Reyes didn't disregard them as well. In fact, he specifically denied that he thinks that anyone's right to vote isn't important. How can that be if their ballots are not counted? Why is that not disenfranchisement? It's not disenfranchisement, Your Honor, because it conflates the burden of complying with the rule with the consequence of not complying with it. To take one example, if a voter shows up to vote at the polls at 8 o'clock on election day and the polls have closed at 7 o'clock, that voter's vote won't be counted. But he hasn't been disenfranchised. He's just failed to comply with one of the quintessential time, place, and manner regulations that the state of Arizona imposes. Voting in the correct analogy, then, if the voting place was open only for 30 minutes at a time when it was pretty clear that no one who lived in a rural area, for example, on a reservation could possibly make it to the polls in time, they haven't followed the rules. But the question is whether the rule is valid. We understand that they didn't get their vote because they didn't follow the rules, but then the question is, is the rule valid? So it kind of jumps over the question for decision. I don't think so, Your Honor, because in that hypothetical, the burden on the voter is having to go and, you know, vote within this 30-minute period. The burden is not what happens if the voter fails to comply. And in a case like that, you might well be able to find a Voting Rights Act violation if, under the totality of the circumstances, it were shown that that practice disenfranchises or abridges or denies the right to vote. That's the argument here. Their argument here, Your Honor, again, I think conflates the burden of complying with the rule, they say it's disenfranchisement, with complying with the rule itself. And again, what we're talking about here is the most commonplace of election rules. It's one that a majority of jurisdictions have, which is you have to vote in your correct precinct. The district court found, again, this is a factual determination, that this imposed the most minimal burden, and certainly not an increase over the ordinary burdens traditionally associated with voting. Why does Arizona change its precincts so often? I don't know the answer. Do you think that's irrelevant? Your Honor, the plaintiffs didn't challenge the practice of moving the precincts. The district court specifically found that. I'm just curious if you could answer that. I don't know the answer to Your Honor's factual question. And do you think it's irrelevant? I don't think it's irrelevant, but I do think that the state of Arizona has in place lots of different mechanisms to mitigate whatever difficulty that might cause. And the district court specifically found that the state and the counties, the Secretary of State, election  But it seems like throwing out an entire OOP ballot seems rather harsh medicine for a voter that you know is otherwise entitled to cast some votes. So I'm curious, in your view, would it be constitutional to throw out an entire ballot if some of the votes were done in red ink or red pen instead of a blue pen? I don't know, Your Honor. That, I think, is very different from the facts of this case. And also, I guess that's why it's a hypothetical. I appreciate that. Your Honor, the district court made specific factual findings. I understand that. But I guess I'm just trying to figure out if you have some kind of case that supports this harsh remedy, throwing out all the votes for what seems like a ministerial violation. Your Honor, I'm not aware of what the state's justifications would be, for instance, for a red ink, blue ink rule. Here we have specific factual findings from the district court that the state has important regulatory interests that are served by the precinct vote rule. The district court adopted the findings of the Sixth Circuit in the Sandusky case and also found, as a factual matter, that the state could not achieve its objectives of, for instance, for voting for local candidates or reducing voter — Can you point to a case that has upheld an out-of-precinct voting procedure like Arizona's? Your Honor, one doesn't come readily to mind, but the vast majority of states have a rule just like this, and I'm not aware of any of them that has been — and again, I should say — But it has a rule that has an enormously different consequence in those states. Your Honor, the district court specifically found that interstate comparisons of out-of-precinct voting are difficult because different states treat provisional ballots differently, for instance. And again, what we're talking about here is an extraordinarily small fraction of the vote. We're talking about, again, only 20 percent of people in Arizona vote in person in the first place, and of those who do, 99 percent of minority voters and 99.5 percent of non- — But, you know, if you look at that the other way around, one percent of minority votes are in the wrong precinct and only a half a percent are non-minority votes. That's where you get the times two. That's true, Your Honor, but I would submit that that is just the barest possible statistical disparity, that this Court's precedents in Gonzales and Salt River make clear cannot by themselves support a Section 2 violation. I'm sorry, when you're finished, Judge Fletcher, I have a different question. Yes, Your Honor. I'm curious why you think it matters what other states do and what their rules are. For example, in the employment context, in a disparate impact case, you know, two employers or 10 employers may all have the same rule that you have to have a college education to do X job, and perhaps in only one of those cases is there a disparate impact that will support a successful claim, but what does it matter that other states or other employers, in my example, have the same rule or a different rule? What analytical assistance is that? What matters in this case, Your Honor, is that the District Court found, as a factual matter, that both the Out-of-Precinct Rule and HB 2023 do not impose burdens that exceed the ordinary burdens traditionally associated with voting. That matters under Crawford. It was on that basis in Crawford that the United States Supreme Court rejected the constitutional challenge to Indiana's voter ID law. Here, the Out-of-Precinct Rule imposes no extraordinary burden. It simply requires people to vote in their precincts. The HB 2023, which I might add, only limits ballot collection. It doesn't totally ban ballot collection. It limits it. This doesn't represent an increase over the ordinary burdens of voting because a voter in Arizona can still, in a 27-day early voting period, choose to either mail the ballot, which means taking it to a mailbox, taking it to a special dropbox, going to vote in person early, going to vote in person on Election Day. There are a panoply of options available to Arizona voters. The District Court took all of this into consideration in concluding that the two laws at issue here apply or impose, rather, only the most minimal burdens. My opponent objected to the notion that under the totality of the circumstances test under Section 2, the District Court should look at the totality of circumstances, but that is precisely what the statutory language requires. It requires the District Court to make a search-and-factual evaluation of the electoral system as a whole to figure out whether the burden... Why do you seem to me to keep blending the Section 2 analysis with the Burdick-Anderson analysis? That's why I kind of tried to correct you from the start, because you were getting off in a direction that's not the focus of your opponent's argument. It's really not the focus of my concern either. So pivot back to the Section 2 analysis and explain why you keep emphasizing a minimal burden. And I guess I didn't think that that was particularly relevant to the Section 2 analysis, but you obviously think it is. I do think it's relevant, Your Honor, because I think that if an electoral practice does not impose a burden that exceeds the ordinary burdens traditionally associated with voting, then it's very difficult to see how it may be it disenfranchises 10 times the number of minority voters as white voters, okay? And, in fact, you can trace that through the use of the Senate factors, too. There's a causal connection between state discrimination in the past and that disproportionate impact. The fact that it's a minimal burden, it just seems to me that's irrelevant to the results that we're seeing on the ground. I disagree with Your Honor's example, I suppose, because I don't think that something that only minimally burdens the right to vote amounts to an abridgment or denial of the right to vote, which is what Section 2 is looking for. Do you have a case that says that if there's a minimal burden, the Voting Rights Act is not violated? Do you have a case that says that, that blends those two concepts as you're doing? I think that the Seventh Circuit's analysis in Frank, the Fourth Circuit's analysis in Lee, the Sixth Circuit's analysis in Ohio Democratic Party, all analyzed these issues in a manner very similar to the way in which I'm analyzing them. In Lee, for instance, the court found that mere disparate inconveniences could not amount to a Section 2 violation. Did it say it was minimal? I don't recall off the top of my head whether the word minimal is specifically used. I don't think the Department of Justice thinks that the minimal, and so are you in agreement with the Department of Justice or not in agreement with Department of Justice on that point? I think that the district court's test, the panel's test, the Department of Justice's test, and our view of the law are all very similar, actually. Well, okay, Guy, I do want to ask you about that to kind of dovetail off of what Judge McGee is saying, because you obviously read the DOJ's brief, and they're going to say, and they generally support your position, but identified two errors made by the district court in analyzing the out-of-precinct policy. One error, asserted error, was about the district court presuming that the plaintiffs must show that the challenge law causes an underlying disparity, and the other was about the suggestion that plaintiffs' claims fail solely because of the small number of voters affected. So, do you agree with DOJ's criticisms? No, Your Honor, I don't. First, on the question of causation, I should note that the reason why the district court analyzed in that way is because the plaintiffs themselves identified those socioeconomic conditions as burdens at closing argument. They were repeatedly asked to identify the burdens that the out-of-precinct rule imposed, and at 2286 of the transcript, those socioeconomic conditions are what they offered, so that's why the district court analyzed them in that way. With respect to this notion that there was a threshold number required by the district court, that simply isn't true. The district court specifically said that it was not finding against the plaintiffs on the basis of their complete failure to provide statistical and quantitative evidence, but rather because the circumstantial and anecdotal evidence they provided was insufficient to show a cognizable Section 2 disparity. The disproportionate and that the Department of Justice advocates in this case, I don't think is very different from the test the district court used. With regard to OOP, for instance, saying that the racial disparities were not practically significant enough to work a meaningful equality. Practically significant, meaningful inequality, I think those are very similar to disproportionate and material or to substantial or meaningful. Whichever adjectives are used, I think ultimately gets the same place. I've seen that my time is running down, so I'll just have one question before you conclude. If I start again, I just on the OOP policy, I just wanted to see if you could explain for me how it takes 20 minutes per ballot to duplicate a ballot in Arizona and how do you reconcile that with the one to three minutes it takes to duplicate a ballot in California? I don't know, Your Honor, except to say the district court made a specific factual finding, as Your Honor knows on that point, that it did take 20 minutes. I know it provided, but the testimony conflicted with the witnesses' depositions and also seems kind of unrealistic, at least to my mind, and I'm trying to understand how to treat that factual finding. Or I guess you're saying that wasn't clearly erroneous? I don't think it was clearly erroneous, Your Honor, but I also think that... When it seems unbelievable? It doesn't seem unbelievable to me. And I want to know why it doesn't seem unbelievable to you. Because there was testimony in that point. I mean, I guess my rudimentary understanding of it is that they need to take two ballots side by side, figure out what races the person is and is not eligible to vote for, and they have to go through by hand and make those adjustments on the ballot. You know, again, there was testimony on the point. The district court made this factual finding. I think it was just... Obviously, it was just one of many, many factual findings in an 83-page opinion that reached, I think, the correct conclusion on the legal questions, but also was not clearly erroneous on the facts. Thank you, counsel. Thank you, Your Honor. We'll hear from the intervener, Arizona Republican Party. Are you going to take a different order than you've prescribed? Okay, very good. It's listed in a different order on mine. We'll hear from the United States. Thank you, Mr. Chief Judge, and may it please the court. John Gore for the United States. The district court in the panel correctly concluded that plaintiffs failed to establish a violation of Section 2's results provision. Three simple propositions dispose of this appeal. First, the district court found that the burdens imposed by HB 2023 and Arizona's precinct voting rule are minimal. Stop right there on Section 2 claims. So is there some de minimis exception to Section 2 that if you want to characterize a burden as minimal, no matter how dramatic the disproportionate impact it has on the ability of minority voters to exercise the franchise, it's not covered by Section 2? Your Honor's exactly what the problem is with the plaintiff's position and with the panel dissent. You're collapsing a disparate outcome with a burden and an unequal opportunity, and that is the wrong analysis under Section 2. That's wrong under Gonzalez. That's wrong under Salt River. That's wrong under a long, unbroken line of cases from this court. You have to explain that because I'm not on the same page. And it's an easy mistake to make, and as I said, it's made repeatedly throughout these cases, which is why we've come in with a different standard. We think the two-part standard is susceptible to this kind of error through no fault of anyone's other than that it's a difficult standard to understand. What Section 2 says, in the essence of a Section 2 results claim, it looks to prove a Section 2 results violation, a plaintiff must show that in the totality of the circumstances, the challenged rule results in protected voters having less opportunity, less voting opportunity than other voters on account of race or color. It doesn't look at whether there's less outcome or a disparate outcome or a disparate result from a particular rule. It looks at whether minority voters or any protected voters have an equal opportunity to participate in the political process and to elect representatives of their choice. The way courts, the courts of appeals, including this court, have analyzed the unequal opportunity question, it's through a burden analysis. So courts look at whether there's a burden because, of course, if there's a burden that minority voters bear that other voters don't bear, that means they have to analyze it. Well, disparate impact, as I'm explaining, isn't sufficient. It may indicate that there's an unequal opportunity because of a disproportionate burden, but it doesn't necessarily prove that there's a disproportionate burden. Not because of the burden, but because of the impact on the ability to vote, you think that's not enough. And a mere disparate impact, as this court has said in Gonzales and Salt River and courts across the country have said. That's one of the things we can consider, correct? Of course, it's something to be considered, but it doesn't establish a violation. So here, as I said, there are three simple propositions. The first, the district court's finding that the burdens are minimal. Second, the district court committed no clear error in making those findings. And third, laws that impose only minimal burdens do not violate section two. How is that possible when subsection A prohibits any voting qualification standard practice or procedure that results in the denial or abridgment of the right of any citizen in the singular? You seem to think that there has to be, you know, a big group or a big hurdle, but it's any practice and any citizen. But actually, that's precisely the opposite of the position we've taken at the Department of Justice. We've said there's no numerical threshold to prove a section two violation and that there's no magic number of seconds before section two. One voter could be enough on the right facts. How about 4,000? Again, it depends on the facts and circumstances of the particular case. Of course, the 4,000 number that I think Your Honor is referring to refers to all out-of-precinct votes, not just those cast by minority voters. But in any event, in the totality of the circumstances, the district court here found that the burdens are minimal. It focused on the burdens and not on the outcome. How much deference do we owe to what's a legal conclusion from a district court as distinct from a factual finding? The conclusion that is minimal, that sounds like a legal conclusion to me rather than a factual finding. Not at all. That's a factual finding that the district court made. But the word substantial is not a factual finding. That's an evaluation. And again, but it's a factual finding and as this court has said in Gonzales, an en banc court from the Ninth Circuit has said that the ultimate finding of whether or not section two has been violated in the totality of the circumstances is also reviewed for clear errors of factual finding. And that's precisely what we have here. The district court had ample evidence to support its findings that the burdens here were minimal. Think about the precinct voting rule for just a minute. The burdens are identifying and traveling to the assigned precinct. That changes often. And even though it changes often apparently, and I'll take the representation as to what the facts are on that, the number of voters affected by the precinct voting rule keeps going down in Arizona. It's a small and vanishing number. More than 99% of all voters of all races are unaffected by the rule. But under your view, if even one voter is denied the ability to vote under the Voting Rights Act because of that practice, then that would be a violation, correct? There is a difference, Your Honor, between being affected by a rule and actually having your rights violated under section two. If it's disenfranchised by that rule, is it a violation? No one's been disenfranchised by the rule. If your ballot isn't counted, is that a disenfranchisement? If your ballot's not counted? The proper analysis, Your Honor, is whether... Is that a yes or no? I can't give a yes or no answer to that question. I'm trying to answer your question, which is... Well, that was my question. ...is that... It was a yes or no question. The proper analysis under section two is whether the voter... Oh, you're not going to answer it? ...faces a discriminatory burden. Yes or no, is that disenfranchisement? Is what disenfranchisement? The inability to have your vote counted. Is that a disenfranchisement? No, disenfranchisement is having your right to vote stripped. Having to comply with voting rules is not disenfranchisement. Let's take the precinct voting rules here for a minute. But regarding the... You took the opposite position regarding the out-of-precinct policy in North Carolina, correct? The Department of Justice was... Yes, that's correct. All right. So you represent the Department of Justice? I do. Okay. And I know that you said that context matters in your brief, but what's so different about the change in position? There's a very significant difference in the North Carolina case, and that is that there was a finding by the court and proof put in that the change to the precinct voting rule in North Carolina was done with an intent to discriminate against minority voters. And so in that case, the Department of Justice adduced evidence that there was an intent to discriminate. Where there's an intent to discriminate, there's a different analysis under Arlington Heights also with respect to the effect of the rule. And so in that case, the Fourth Circuit held that there had been an intent to discriminate, and so that's a totally different legal analysis than the disproportionate and material burden analysis that we're advocating here. And let me just point out, the ACLU has agreed with us in its amicus brief on page 12. It also advocates the disproportionate and material burden analysis that we're advocating here. But back to the precinct voting rule. The burdens are minimal. Individuals who are voting out of their assigned polling place. And the district court made some findings that were very important in this regard. The district court pointed out that the state hasn't made it needlessly difficult to identify polling places. It does voter outreach efforts. It educates voters whenever it moves a polling place. And of course, there's a myriad of other options and opportunities for voters to cast a ballot in Arizona. Okay, so why, just remind me if I'm remembering your opponent's argument right. They say that the burden is severe here if you focus on the practice that they're actually challenging. They're not challenging the state's ability to run a precinct voting system, right? And that exposes the flaw in their argument. They're taking the consequence of noncompliance and conflating that with the burden of compliance. What section two looks for is an equal opportunity to participate. And an equal opportunity to participate is informed by the presence or absence of a burden on compliance. What they're talking about is not a burden on compliance. It's no more difficult to comply with the precinct voting rule because Arizona throws out the entire ballot than it would be if Arizona threw out half the ballot. Sure. And that's the right analysis for section two. But it is obviously harder for minorities to comply with the precinct voting rule, as you're putting it, because of a whole myriad of factors, one of which, several of which the state is responsible for. Number one, moving the polling places all the time. Number two, though, I think even more so is the practice of the poll workers of not telling people that you're at the wrong place and if you cast a provisional ballot, it's not going to be squarely on the state's shoulders. It may be on the state's shoulders and it may not be. But the district court considered all that evidence in the totality of the circumstances and made the finding that the burden is minimal. It's not minimal. We know it's not minimal because we see the results that the system is producing in terms of its disparate impact. I respectfully disagree, Your Honor. Of course, this court has to defer to the district court's finding under the clear error standard. And that finding was amply supported by the record. Let me just talk for a moment about the dissent from the panel opinion because it exemplified some of the problems with the two-part test and it, in effect, turned a disparate impact into a Section 2 violation on the precinct voting rule. The dissent didn't engage in a clear error review. It reweighed the evidence to overrule the district court's finding that the burden was, in fact, minimal. Then on the two-step analysis on Step 1, it said that its analysis ought to end on the showing that the precinct voting rule has a disparate impact. That's totally incorrect under Section 2. Section 2 looks for unequal opportunity, not unequal outcome. I want to ask about materiality a little bit because that was discussed previously before your time is up because your test for materiality is if – I think it's – I'm reading from it. It creates an impediment to the ability to vote that is not offset by other opportunities to register or vote. I'm trying to see how we can say HB 2023 isn't material under your own test. For Native Americans living in rural Arizona, there's record evidence that says their polling places are done by guesswork, that people have to drive 40 miles to get to a polling place or to the post office, and that the overwhelming majority of Native Americans in Arizona don't have home mail service, and that between 20 to 50 percent of households don't have access to a car. I just want to figure out how is it not material that Native Americans can't give their vote to a ballot – or a voted ballot to someone else to turn it in for them. MR. BOUTROUS. May I briefly respond, Mr. Chief Judge? Thank you. Two points on that very quickly. First of all, the district court pointed out that there are limitations in that evidence with respect to lack of home mail service in certain rural counties. That evidence is an imprecise proxy, in the words of the district court, for both use of ballot collectors and a material burden. It doesn't tell you identify any single voter who faces a disproportionate and material burden because of HB 2023, and it doesn't tell you the number or the race of voters who used ballot collectors in the past. Those are huge gaps in the plaintiff's evidence. There's another major gap in the plaintiff's evidence, which is they didn't produce any testimony from any voter who came in and took the stand and said HB 2023 makes voting substantially more difficult, or any voter who came in and said, in the past, I used a ballot collector because I don't have home mail. They didn't connect it up. MS. MCCARTHY. Why wasn't the testimony from the collectors enough? It seems like they were trying to be efficient in trying to get – if the court credited the collectors, which apparently it did, then the testimony of the people who were collecting the ballots, you know, was that there were numerous people that gave it to them. Why did – why do you need the one part? MR. HENRY. Because it's the right of the voter and not the right of the collector. MS. MCCARTHY. No, but if you credit that – the testimony of the people who were going around collecting them, I'm just trying to figure out – MR. HENRY. And that – but that testimony doesn't show there's a disproportionate and material burden because of the second half of our test, which is there are so many other opportunities for Arizona. And the dissent from the panel opinion never ran an analysis of whether those are sufficient to offset whatever limitations are being set by HB 2023 because there's not sufficient record evidence to understand the effect of HB 2023 and the extent, if any, to which it's imposing a burden, disproportionate and material or otherwise, on minority voters. There are significant gaps in the record on that point, and the organizational plaintiffs failed to put in evidence to carry their burden on that. MR. HENRY. Thank you, Counselor. MR. JOHNSON. Chief Judge, panel, may it please the Court, my name is Brett Johnson on behalf of the Intervenor Appellees. The Intervenor is sought to participate in this case to ensure that the interests of local candidates and local issues are taken into account in evaluating the entirety of the election framework. And just to assist on the importance of that local aspect of it, in regard to the precincts themselves, the precincts aren't moving. The polling locations are moving. That's an entirely different aspect. The precincts are set as part of the record. The polling locations move. Why do the polling locations move? Buildings are foreclosed on. A school or a church no longer wants to have a polling location there because of that. MR. HENRY. Now, is that evidence in the record? I mean, I asked whether there was any reason. They said, we have no reason. We don't know. Now, are you making this up, or do you have evidence in the record as to why we have this frequency? MR. JOHNSON. Yes, Your Honor, you do. You had the State Elections Director who testified to that fact. You had Brad Nelson from the Pima County Elections Department that also testified to that effect, both in deposition as well as in the trial, I believe. So from that perspective, I remember clearly the issue of the foreclosed building. So from that perspective, you have... MR. HENRY. But the question isn't whether it's from time to time that happens. The question is Arizona seems to do it much more frequently than any other state of which I'm aware. I mean, buildings are foreclosed in every state, yet Arizona seems to be changing the precinct voting location with extraordinary frequency. MR. JOHNSON. Actually, Your Honor, that's where the record is silent. That would be a subgroup analysis underneath the 14th Amendment, and that's exactly what Judge Reyes determined that the proponent or the plaintiffs did not prove is to the quantity of that actually occurring as well as who that impacted on the voter. That was a significant failing on the behalf of the plaintiffs. And they also raised the subgroups of transportation, public transportation. There was testimony in the record that precincts, were put next to public transportation in the residence of the voter. Your Honor, in regard to the ballot, you asked a question in regard to why does it take 20 minutes. At ER 520, Brad Nelson from Pima County clearly delineated why it took that. It's because there takes two sets, two pairs. First, you have one set of two people who are on a panel, one from each party, who review a ballot. And that ballot, as Your Honor probably knows, is quite long because we have merit selection in Arizona, and all the judges are on that ballot. So that takes quite a bit of time. Then it goes to another panel, it's reviewed again, and finally an administrator reviews before it's actually put into the machine. California, from that individual's testimony, that was, he took three minutes because there's one, in my remembering of that testimony, there's one individual who's kind of comparing it. It's never voted in California, but it seems like I've heard them, but their ballots are very long. Your Honor, their counties are actually much smaller. This was evidence also in the record. Maricopa County is a very large jurisdiction, 1.6 million people. Santa Clara County, maybe 500,000. There were a determination and actually... There are more than 500,000 people in Santa Clara County. Now, yes, okay. Thank you, Your Honor. Having grown up in the 408, I can tell you that. Okay. But under the public integrity case from this court, that's completely appropriate for other jurisdictions to come up with different laws and different ways to manage an election. From that perspective, a California county can have one person review a ballot versus Maricopa County and Pima County that has multiple panels. Your Honor, you're also asked about the red ink versus blue ink analysis. Well, actually, on the ballots, I believe it says you have to use black ink. I understand that. Yeah, because you have to use black ink because of the computers. The computers have to be able to read that ballot. But if you used red ink, what would happen to your ballot? I apologize, Your Honor? If you used red ink, what would happen to your ballot? If you used red ink, it would go through the machine and not be counted. It would not be counted as part of the process, and that is not one of the objections that plaintiffs have raised here because the computer is not reading it. After it's brought out, they're put into stacks for further review or potential challenge. But you decided to use red ink. It clearly said on top of the ballot, use black ink. There's a black marker that is provided on the in-person voting to be able to do it. It's not an increase of the normal purposes of voting to have to be able to use the black ink because that's what you have to use in the ballot. My point is, I mean, is this not considered a ministerial sort of violation? Why shouldn't at least the sum of the votes that were made for statewide offices be counted or for national offices be counted? Well, thank you, Your Honor, because that's exactly why I'm here today, is because the local candidates believe in local issues. And if you are, Your Honor, may I finish? If you are only looking at the national election, who's running for president, who's running for Senate, who's running for governor, you are eliminating the laboratory of democracy upon which all elections are held. That's what you held in Public Integrity Alliance. So from that perspective, those education bond matters, and it's important to steer people, as in Sandusky, to the proper polling location. With that, thank you, Your Honor. Let me just address the 20 minutes issue right quick. The district court, that was clear error. The district court impeached that witness itself, actually, at ER 563, 564, by pointing out that it would take approximately 3,000 hours for them to count the ballots they do count now. Arizona already has a procedure that it uses to count ballots, federal ballots, where the person doesn't show proof of citizenship, and they don't allow that person to vote in their state elections. It doesn't take 20 minutes. It's feasible, which is the district court's finding here, and I would argue is dispositive of that issue. It is feasible. So the only real justification for this precinct, for this practice of throwing out the ballots in their entirety, which is the practice we are based on, the only justification is administrative convenience. Like I said, 21 states and the District of Columbia count these ballots. Arizona itself counts some ballots. They have a duplication procedure that they use by choice. We had somebody from California who testified, an expert who was not found incredible, who said it takes like three minutes in California. It's feasible. I'm not sure that the finding of feasible really reflects what the district court said, because what the district court said is it would impose a significant financial and administrative burden. So it could be done, but it's not without cost. It is not without a cost, Your Honor, but the word feasible literally... And so is significant financial and administrative burden. I'm quoting both instances from what the district court's order says. It's feasible, it's doable, but at a high cost. Well, why isn't the county allowed to consider the cost? The county can consider the cost. There's no evidence in the record that it is a significant cost. Oh, no, stop. I just read to you from the finding. You want to pick part of it, and I'm reading the second part of it. Why isn't the second part of it just as relevant? I would suggest, Your Honor, that that is clear error, that... Based on what? You challenged that finding as clearly erroneous, based on what? I was actually reading from the record from footnote 17, I believe, of our opening brief, but the question, I think, Your Honor, probably even more importantly is, given that the burden on the one hand is complete disenfranchisement of the voter for offices for which they're constitutionally eligible to vote, and given that it is feasible for the state of Arizona to count those votes, they already do it in other circumstances, that even a costly fix can't provide a justification for the complete disenfranchisement. Thank you, counsel. Thank you both. I thank all of you for your arguments this morning and your briefing. In case you start, you'll be submitted for decision, and we'll be in recess. Court is adjourned and in recess.
judges: O'scannlain, Thomas, Graber, W. Fletcher, Rawlinson, Clifton, Bybee, Callahan, Murguia, Watford, Owens